UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Arcimoto Inc. Securities Litigation | Master File No.: 1:21-cv-02143-BMC |
| | **CONSOLIDATED AMENDED COMPLAINT** |
| | CLASS ACTION |
| This Document Relates To: All Actions | |

Lead Plaintiff Tarun Kapoor and named Plaintiffs David Chan, Konstantin Khludenev, and Prineet Amin ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls, and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Arcimoto Inc. ("Arcimoto" or the "Company"), analysts' reports and advisories about the Company, interviews with confidential witnesses, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein and will be shown after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      Plaintiffs bring this action as a federal securities class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who (1) purchased Arcimoto's publicly traded common stock at artificially inflated prices between October 2, 2019 and March 22, 2021, both dates inclusive ("Class Period"), and were damaged when the artificial inflation dissipated upon the corrective disclosure; and/or (2) held Arcimoto common stock as of the close of business on April 22, 2020 and were eligible to vote at Arcimoto's June 20, 2020 annual shareholder meeting.[1] On behalf of the Class, Plaintiffs bring claims pursuant to Section 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.      In October 2019, after years of development, redesigns, and numerous vehicle recalls filed with the National Highway Traffic Safety Administration ("NHTSA"), Arcimoto had just begun retail production of its featured product, the Fun Utility Vehicle ("FUV"). The FUV is a small, two-passenger, three-wheel electric vehicle approximately one third the size of a standard car. According to the Company's 2019 annual report the FUV is generally regulated as a motorcycle-class vehicle.

3.      As Arcimoto's 2019 annual report explained, "[t]he Company has not achieved positive earnings and operating cash flows to enable the Company to finance its operations internally, which raises substantial doubt about its ability to continue as a going concern." Indeed, as the report indicated, at the end of 2019 the Company had only $5.8 million in cash, after burning through a net loss from operations of nearly $15 million that year.

---

[1] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

4.     Still chiefly reliant on outside investments to finance the Company's operations, Defendants were motivated to juice up investor excitement, and thus Arcimoto's stock price, by continually issuing good news about the Company's prospects for attaining production, sales, and operational profits. In October 2019, still facing this acute pressure to impress outside investors, Defendants announced Arcimoto's first rental franchise partnership with a company in Key West called R-KEY-MOTO LLC ("R-KEY-MOTO").

5.     Unbeknownst to Arcimoto investors, R-KEY-MOTO was owned and controlled by FOD Capital LLC ("FOD Capital") and its managing director, Michael Raymond. At that time, when Arcimoto was touting its long-awaited initial production of vehicles and its new rental franchise arrangement with R-KEY-MOTO, FOD Capital and Michael Raymond were Arcimoto's second-largest shareholders, as owners of 9.3% of the Company's common stock and voting rights. Thus, R-KEY-MOTO was actually an undisclosed related party, and the Company's transaction with R-KEY-MOTO was an undisclosed material related party transaction.

6.     In March 2021, Bonitas Research LLC ("Bonitas") published a report documenting, among other problems at the Company, the undisclosed relationship between Arcimoto and R-KEY-MOTO. The market took notice of this corrective disclosure and Arcimoto's stock price quickly dropped over $1.00 per share, or nearly 7%, harming investors.

7.     A few weeks after the Bonitas Report, Defendants admitted that they had engaged in undisclosed material related-party transactions with entities owned and controlled by FOD Capital. Specifically, in its 2021 Proxy Statement, Arcimoto admitted that, contrary to its prior public statements, including its 2020 Proxy Statement: "***During the years ended December 31, 2019 and 2020, we sold FUVs for $166,203 and $155,688 respectively, to entities controlled by FOD Capital LLC, a 5% shareholder of our common stock***."

8.      In addition to FOD Capital being Arcimoto's second-largest shareholder and single largest outside investor at the time of the R-KEY-MOTO announcement, Defendants had previously entered into multiple agreements with FOD Capital and Mr. Raymond with respect to FOD Capital's investment in Arcimoto. These agreements were signed by Defendant Frohnmayer on behalf of Arcimoto and by Mr. Raymond on behalf of FOD Capital. Defendants must have negotiated and corresponded with Mr. Raymond and FOD Capital in signing these agreements. Indeed, part of the Company's financing arrangements with FOD Capital involved granting FOD Capital franchise rights in the Key West area. Therefore, when Defendants negotiated and entered into the transaction with R-KEY-MOTO, also with Mr. Raymond, they either knew or were severely reckless in not knowing that R-KEY-MOTO was a related party.

9.      Defendants' gambit was successful. During the Class Period, following the R-KEY-MOTO announcement, the Company was able to raise approximately $82 million from the sale of its common stock, made possible as Arcimoto's stock price skyrocketed from approximately $3 per share to nearly $17. The increased share price also allowed the Company to retire over $1.3 million in convertible notes in June 2020 through converting the notes into shares, rather than paying cash.

10.     During the Class Period, the Company was still slowly ramping up its production capacity. In fact, Arcimoto delivered less than 100 vehicles in each of 2019 and 2020. The revenues from these limited sales were far from sufficient to be able to sustain the Company's operations without the $82 million they raised, particularly given their rate of operating losses. Thus, during the Class Period, Arcimoto was reliant on outside investments to maintain its continued operations. Defendants knew exactly what they were doing in hyping up their new Key West partnerships as

they misleadingly omitted that their business partner was not a true, independent customer, but rather a related party owned and controlled by Arcimoto's second-largest shareholder.

11.     SEC regulations and U.S. Generally Accepted Accounting Principles ("GAAP") require the disclosure of material related party transactions. Defendants' failure to disclose R-KEY-MOTO as a related party violated SEC regulations and GAAP, rendering their public statements to investors false and misleading.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to §§10(b), 14(a), and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78n(a) and 78t(a)) and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC (17 C.F.R. §§240.10b-5 and 240.14a-9).

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

14.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

16.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## PARTIES

17.     Lead Plaintiff Tarun Kapoor, as set forth in his certification on file with the Court (Dkt. No. 15-2) and incorporated by reference herein, purchased shares of Arcimoto common stock at artificially inflated prices during the Class Period and was damaged upon the dissipation of the artificial inflation by the corrective disclosure alleged herein.

18.     Named Plaintiff David Chan, as set forth in his PSLRA Certification attached hereto as Exhibit 1, purchased shares of Arcimoto common stock at artificially inflated prices during the Class Period and was damaged upon the dissipation of the artificial inflation by the corrective disclosure alleged herein.

19.     Named Plaintiff Konstantin Khludenev, as set forth in his PSLRA Certification attached hereto as Exhibit 2, purchased shares of Arcimoto common stock at artificially inflated prices during the Class Period and was damaged upon the dissipation of the artificial inflation by the corrective disclosure alleged herein.

20.     Named Plaintiff Prineet Amin, as set forth in his PSLRA Certification attached hereto as Exhibit 3, purchased shares of Arcimoto common stock at artificially inflated prices during the Class Period and was damaged upon the dissipation of the artificial inflation by the corrective disclosure alleged herein.

21.     Defendant Arcimoto purports to operate in the business of manufacturing small, two-passenger, three-wheeled electric vehicles. The Company's chief product during the Class Period was the FUV. Arcimoto is incorporated and headquartered in Eugene, Oregon. Arcimoto common stock shares traded on the NASDAQ under ticker symbol "FUV" during the Class Period.

22.     Defendant Mark Frohnmayer was the founder, President, and Chief Executive Officer of Arcimoto at all relevant times.

23.     Defendant Douglas M. Campoli was the Chief Financial Officer of Arcimoto at all relevant times.

24.     Defendants Frohnmayer and Campoli are sometimes referred to herein as the "Individual Defendants."

25.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

26.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

27.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

28.     The Company and the Individual Defendants are referred to herein, collectively, as "Defendants."

## ALLEGATIONS OF SECURITIES FRAUD

### Company Background

29.     According to Arcimoto's annual report for 2019, filed with the SEC on Form 10-K on April 14, 2020 ("2019 10-K"), Arcimoto was founded in 2007. According to the 2019 10-K, Arcimoto is "engaged primarily in the design, development and manufacture of ultra-efficient three-wheeled electric vehicles."

30.     The Company went public in September 2017 through a Regulation A+ offering. Under Title IV of the 2015 Jumpstart Our Business Startups (JOBS) Act, a private company can raise public funding through a Regulation A+ offering, which involves a more streamlined, expedited review process. In a Regulation A+ offering, a company is required to make its offering memorandum public just 21 days prior to SEC qualification, with a lower level of scrutiny than for a traditional public offering.

31.     According to the 2019 10-K, "2019 was a watershed year for the Company, which saw us complete compliance testing required to produce and sell retail vehicles, outfit the scalable, automated, vertically-integrated Arcimoto Manufacturing Plant for retail production; begin retail production of the Fun Utility Vehicle (FUV); develop our post-production programs including service, support, recall and supplier quality management; and sign, open, and deliver first vehicles to our first rental franchisee in Key West, Florida."

32.     The Company first started retail production of its vehicles in September 2019, but by the end of the year it had produced only 57 vehicles and delivered only 46 of them to customers. As the Company explained in its 2019 10-K, it started retail production at "one FUV per build day

and ramped to two per build day in the first quarter of 2020, prior to the COVID-19 production shutdown."

33.     According to Arcimoto's annual report for 2020, filed with the SEC on Form 10-K on March 31, 2021 ("2020 10-K"), in 2020, Arcimoto produced only 117 vehicles and delivered just 97 of them to customers.

34.     According to the 2019 10-K, Arcimoto's flagship product is the FUV. The FUV is a small, two-passenger, three-wheel electric vehicle approximately one third the size of a standard car. According to the Company's 2019 annual report the FUV is generally subject to federal regulations as a motorcycle-class vehicle. In the 2019 10-K, the Company reported having about 4,200 FUV "pre-orders," secured with small refundable deposits. These "pre-orders" were typically $100 deposits that secured a customer's place in the production queue. They were fully refundable until the customer's order was ready for production. The FUV retailed for approximately $20,000 per vehicle.

35.     The Company encountered significant struggles in producing a street-ready vehicle ready for actual customers. According to the NHTSA, by the time Arcimoto was beginning its retail production in September 2019, the Company had already filed ten recalls for major safety issues affecting its 2017 FUV models and nine more affecting its 2018 FUVs. The Company also issued eleven recalls for major safety issues affecting its 2019 FUVs during the Class Period.

36.     Plaintiffs' investigators spoke with former employees of the Company who have personal knowledge of the facts alleged and attributed to them in this Complaint.

37.     Former Employee 1 ("FE1") served as a software engineer for Arcimoto from September 2020 to January 2021. According to FE1, the Company held weekly or bi-weekly "all hands" meetings which were led by Defendant Frohnmayer, and which FE1 attended remotely.

FE1 reported that the Company had a dearth of quality control, particularly over its software. FE1 also recalled that the Company did not have a rigorous testing process, and production specifications were often unclear or missing altogether. FE1 described the Company's production process as "a bit of a rogue operation regarding quality," and that the Company was essentially "shooting from the hip." FE1 reported that by early 2021, the Company was still only able to produce up to 5-6 vehicles each day.

38.     Former Employee 2 ("FE2") served as interim Chief Technology Officer and Chief Information Officer from May 2017 to January 2018, including during the Company's initial public offering. FE2 explained that with respect to "pre-orders," customers would pay a $100 fully-refundable deposit to secure their spot in the production queue, and it was not uncommon for these potential customers to change their minds and request a refund. According to FE2, once production started on a customer's vehicle, the customer would be moved to another tier where they could confirm their order and negotiate the specifications for the vehicle, and they would make an additional deposit of approximately $500.

39.     Former Employee 3 ("FE3") served as a software engineer for Arcimoto from February 2019 to May 2020. FE3 reported that prior to September 2019, Arcimoto's vehicles, specifically the FUVs, were not street legal yet, recalling that "we [Arcimoto employees] could drive them around the parking lot but not in the street."

40.     Former Employee 4 ("FE4") served as an Assembly Technician for Arcimoto from September 2018 to March 2020. FE4 reported that in the early days of his tenure, the Company "didn't have things laid out entirely. They just wanted to get going and build vehicles." According to FE4, the Company's plan was to keep building vehicles and make design changes as they went. FE4 reported that some early customers knew they were receiving "beta versions" of the FUV and

10

that various issues and recalls could arise. As FE4 recalled, building the FUVs was a new and ever-changing process with poor quality control, particularly in the early stages where the Company was "just scrambling to get things out the door." According to FE4, as the Company made changes to the FUV design, they would have vehicles brought in to switch out various components.

## FOD Capital Makes a Major Investment in Arcimoto, and Owns and Controls R-KEY-MOTO and Wahlburgers Key West, Which Defendants Knew Were Related Parties

41.     On December 28, 2018, Arcimoto filed a current report with the SEC on Form 8-K ("December 28, 2018 8-K"), signed by Defendant Campoli, announcing that the Company had entered into a Subscription Agreement with FOD Capital, pursuant to which the Company issued FOD Capital 500,000 shares of Arcimoto common stock, a warrant to purchase up to 942,857 additional shares, and a senior secured note in the principal amount of $3,000,000.

42.     Filed with the December 28, 2018 8-K as Exhibit 4.1 was a copy of the Subscription Agreement between Arcimoto and FOD Capital. The Subscription Agreement was signed by Defendant Frohnmayer, as CEO of Arcimoto, and Michael T. Raymond, as manager of FOD Capital.

43.     Also filed with the December 28, 2018 8-K as Exhibits 10.1, 10.2, 10.3, and 10.4, respectively, were copies of the Senior Secured Promissory Note, Security Agreement, Intellectual Property Security Agreement, and Collateral Assignment of Lease referenced in the December 28, 2018 8-K. Each of these four documents were signed by Defendant Frohnmayer, as CEO of Arcimoto, and Michael T. Raymond, as manager of FOD Capital. The Intellectual Property Security Agreement and the Collateral Assignment of Lease also included the address for FOD Capital: 7009 Shrimp Rd, STE #4, Key West, FL 33040.

44.     On December 27, 2018, Arcimoto also filed a prospectus with the SEC on Form 424B5 in connection with FOD Capital's investment in the Company. According to the prospectus,

Arcimoto had 14,532,341 shares of common stock outstanding before FOD Capital's investment, and 15,975,198 shares outstanding after, assuming full exercise of the warrant. That means that FOD Capital owned approximately 9.0% of Arcimoto at this time.

45.     On January 4, 2019, FOD Capital and Michael T. Raymond filed a joint Schedule 13G report with the SEC, signed by Mr. Raymond both individually and as Manager of FOD Capital. In this Schedule 13G, FOD Capital and Mr. Raymond confirmed that they were the beneficial owners of 1,442,857 shares of Arcimoto common stock, comprising 9.0% of the Company's outstanding shares of common stock. The January 4, 2019 Schedule 13G also included FOD Capital's address: 7009 Shrimp Rd, STE #4, Key West, FL 33040.

46.     On April 1, 2019, Arcimoto filed a proxy statement with the SEC on Form DEF 14A, signed by Defendant Frohnmayer. In this proxy statement, the Company disclosed that FOD Capital beneficially owned a total of 1,442,857 shares of the Company's common stock, or 9.3% of the shares outstanding. According to the proxy statement, that ownership stake made FOD Capital the Company's second largest shareholder, trailing only Defendant Frohnmayer. Thus, at this time FOD Capital was Arcimoto's single largest outside investor.

47.     On September 18, 2019, Arcimoto filed a current report with the SEC on Form 8-K, signed by Defendant Campoli, announcing that the Company had entered into a Restated Subscription Agreement with FOD Capital. Under the Restated Subscription Agreement, the Company issued to FOD Capital a convertible note for $500,000, and granted FOD Capital "franchise rights for the Florida Keys." The signature blocks for the Restated Subscription Agreement and corresponding Convertible Promissory Note, attached to the current report as Exhibits 4.1 and 10.1, respectively, each provided for Defendant Frohnmayer to sign as CEO of Arcimoto, and Michael T. Raymond as manager of FOD Capital.

48.    On November 22, 2019, Arcimoto filed a prospectus with the SEC on Form 424B4, in connection with an offering of up to 5,750,000 shares of common stock for up to $9.3 million. According to this prospectus, FOD Capital was the beneficially owner of 1,562,088 shares as of November 14, 2019, which amounted to 8.0% of the Company. According to this prospectus, these holdings made FOD Capital the Company's third largest shareholder at this time.

49.    FOD Capital's website lists Michael Raymond as its Managing Director, on a page titled "Our Leadership." The same webpage lists FOD Capital's address as: 7009 Shrimp Road, Suite 4, Key West, FL 33040.[2]

50.    R-KEY-MOTO is registered in Florida. Its registered principal address is listed as: 7009 Shrimp Rd Ste 4, Key West, FL 33040. Michael Raymond is listed as the registered agent and manager of R-KEY-MOTO, at the same address. Upon information and belief, based on the facts alleged herein, R-KEY-MOTO is owned and controlled by FOD Capital and Michael Raymond.

51.    According to the restaurant inspection database provided by the Tallahassee Democrat, a Florida-based newspaper, Wahlburgers Key West is owned by Wahlkey LLC ("Wahlkey").[3] The website Bizapedia, citing the Florida Department of State as its source, also lists Wahlkey as the owner and sole principal of Wahlburgers Key West.[4]

52.    Wahlkey is registered in Florida. Its registered principal address is 7009 Shrimp Rd Ste 4, Key West, FL 33040. Michael Raymond is listed as the registered agent and manager of Wahlkey, at the same address. Upon information and belief, based on the facts alleged herein,

---

[2] *Available at* https://www.fodcapital.com/leadership-team

[3]   *Available at* https://data.tallahassee.com/restaurant-inspections/monroe/wahlburgers-key-west/sea5428354/7662717/

[4] *Available at* https://www.bizapedia.com/fl/wahlburgers-key-west.html

Wahlkey, and thus Wahlburgers Key West, are owned and controlled by FOD Capital and Michael Raymond.

53.     Arcimoto had no more than three executive officers at the relevant times, two of whom were Defendants Frohnmayer and Campoli. FOD Capital has and had at the relevant time only three principals, one of whom was and is Mr. Raymond.

54.     In the course of discussing, negotiating, and signing the myriad agreements between Arcimoto and FOD Capital, R-KEY-MOTO, and Wahlburgers Key West, Defendants Frohnmayer and Campoli must have known, or were severely reckless in not knowing, that R-KEY-MOTO and Wahlburgers Key West were owned and controlled by FOD Capital and Mr. Raymond. Arcimoto's own press release announcing the R-KEY-MOTO deal referred to Mr. Raymond as a principal of R-KEY-MOTO, and included a direct quote from Mr. Raymond. These facts, along with the Company's history of business dealings with FOD Capital, R-KEY-MOTO, and Walhburgers Key West, demonstrate that Defendants Frohnmayer and Campoli knew, or were severely reckless in not knowing, that R-KEY-MOTO and Wahlburgers Key West were related parties to Arcimoto.

55.     While investors parsing through each of these various public filings may have been able to deduce the connection between FOD Capital and R-KEY-MOTO if they were actively seeking out that information, they were under no obligation to do so, the connection was not well known to investors, and Defendants' false and misleading omissions concerning the Company's related party transactions deceived investors and would not have alerted investors as to the need for any such independent sleuthing.

### Defendants Made False and Misleading Statements by Omitting Material Facts About R-KEY-MOTO's Status as a Related Party

56.      On October 2, 2019, Arcimoto issued a press release announcing its first rental

franchisee. In relevant part, the press release said:

> Arcimoto, Inc.®, (NASDAQ: FUV) makers of the Fun Utility
> Vehicle® (FUV®), Rapid Responder™, and Deliverator™ —
> affordable, practical, and joyful pure electric vehicles for everyday
> commuters and fleets — announced today that it has signed its *first
> rental franchise, which will open in the Florida Keys and be
> operated by Key West-based franchisee R-KEY-MOTO, LLC.*

> "We think Key West will be an amazing home for our first rental
> franchise and pilot of our rental franchise model," said Arcimoto
> founder and president Mark Frohnmayer. "*We are very excited to
> partner with the R-KEY-MOTO team*, combining their local market
> expertise and resources with Arcimoto's ultra-efficient and very fun
> vehicles."

> *Located at the Stock Island Marina Village, the new FUV Hub
> location will house 21 FUVs* to be used as rental vehicles for
> tourists and cruise ship passengers to explore Key West, one of the
> most popular tourist destinations in the world. In addition, the FUV
> Hub will share vehicles with the A&B Marina Complex and the
> Perry Hotel Key West. Guests will be able to rent FUVs directly
> from the concierge and explore Stock Island and Key West.

> (Emphasis added).

57.      The October 2, 2019 press release also included a quote from Michael Raymond,

who was identified in the press release only as "principal of R-KEY-MOTO."

58.      These statements in the October 2, 2019 press release were misleading because

Defendants knew or were severely reckless in not knowing, but failed to disclose, that R-KEY-

MOTO was a related party, and thus the Company's transaction with R-KEY-MOTO was an

undisclosed material related party transaction, due to the fact that R-KEY-MOTO was owned and

controlled by FOD Capital and Michael Raymond, who owned approximately 9.3% of Arcimoto's

common stock at the time of the transaction.

59.     On November 26, 2019, Arcimoto issued a press release announcing that it had "delivered the first two of 21 FUVs to R-Key-Moto, LLC, Arcimoto's first rental franchise and flagship rental outlet, located in the beautiful Florida Keys." The November 26, 2019 press release also quoted Defendant Frohnmayer as saying: "It was a distinct honor to personally deliver the first two Fun Utility Vehicles to our Key West franchise partner. R-Key-Moto's top-notch facilities are a perfect home for Arcimoto's pioneer franchise fleet."

60.     These statements in the November 26, 2019 press release were misleading because Defendants knew or were severely reckless in not knowing, but failed to disclose, that R-KEY-MOTO was a related party, and thus the Company's transaction with R-KEY-MOTO was an undisclosed material related party transaction, due to the fact that R-KEY-MOTO was owned and controlled by FOD Capital and Michael Raymond, who owned approximately 9.3% of Arcimoto's common stock at the time of the transaction.

61.     On April 14, 2020, Arcimoto filed its 2019 10-K. The 2019 10-K was signed by Defendants Frohnmayer and Campoli. In the 2019 10-K, the Company made the following statement with regard to revenues generated through transactions with related parties: "For 2019 we had revenue from the sale of our vehicles of $891,356, $20,015 of which was with a related party." In the 2019 10-K, the Company reported 2019 revenues of $891,356 from product sales, and $96,494 from other sources, each a nearly 10-fold increase over the prior year.

62.     The 2019 10-K also touted the Company's Key West business, underlining the importance of the transaction to the Company's business. Specifically, the 2019 19-K stated that: "2019 was a watershed year for the Company, which saw us … sign, open, and deliver first vehicles to our first rental franchisee in Key West, Florida."

63.     These statements in the 2019 10-K were misleading because Defendants knew or were severely reckless in not knowing, but failed to disclose, that R-KEY-MOTO was a related party, and thus the Company's transaction with R-KEY-MOTO was an undisclosed material related party transaction, due to the fact that R-KEY-MOTO was owned and controlled by FOD Capital and Michael Raymond, who owned approximately 9.3% of Arcimoto's common stock at the time of the transaction.

64.     Appended as exhibits to the 2019 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Frohnmayer and Campoli, wherein they certified that the 2019 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "information contained in the Report fairly presents, in all material respects, the financial condition of the registrant at the end of the period covered by the Report and results of operations of the registrant for the periods covered by the Report."

65.     These SOX certifications were false and/or misleading because Defendants knew or were severely reckless in not knowing, that the 2019 10-K did contain misleading statements and omissions of material fact as outlined above, and accordingly, the information contained in the 2019 10-K did not fairly present the financial condition and results of operations of the Company.

66.     Also on April 14, 2020, Arcimoto issued a press release, attached as Exhibit 99.1 to a current report filed with the SEC on Form 8-K. The April 14, 2020 8-K was signed by Defendant Campoli, and stated: "At the end of 3Q19, the Company signed its first rental franchise

in Key West with R-KEY-MOTO, LLC and subsequently delivered its first 8 FUVs to the franchisee by the end of 2019."

67.     These statements in the April 14, 2020 press release were misleading because Defendants knew or were severely reckless in not knowing, but failed to disclose, that R-KEY-MOTO was a related party, and thus the Company's transaction with R-KEY-MOTO was an undisclosed material related party transaction, due to the fact that R-KEY-MOTO was owned and controlled by FOD Capital and Michael Raymond, who owned approximately 9.3% of Arcimoto's common stock at the time of the transaction.

68.     On April 29, 2020, Arcimoto filed a notice of its annual meeting of shareholders and 2020 Proxy Statement with the SEC on Form DEF 14A ("2020 Proxy Statement"). The 2020 Proxy Statement was signed by Defendant Frohnmayer and made the following statement as to material related party transactions entered into by the Company since 2019, omitting any mention of Arcimoto's transaction with R-KEY-MOTO:

> **CERTAIN RELATIONSHIPS AND RELATED-PARTY TRANSACTIONS**
>
> Since January 1, 2019, except as set forth below, there were no transactions to which we were or are a party in which the amount involved exceeded or exceeds $120,000 and any of our directors or executive officers, any holder of 5% of our capital stock or any member of their immediate family had or will have a direct or indirect material interest.

69.     These statements in the 2020 Proxy Statement were false and misleading because Defendants knew or were severely reckless in not knowing, but failed to disclose, that R-KEY-MOTO was a related party, and thus the Company's transaction with R-KEY-MOTO was an undisclosed material related party transaction involving more than $120,000, due to the fact that R-KEY-MOTO was owned and controlled by FOD Capital and Michael Raymond, who owned approximately 9.3% of Arcimoto's common stock at the time of the transaction.

18

70.     On June 11, 2020, Arcimoto filed its quarterly report for the first quarter of 2020 with the SEC on Form 10-Q ("20Q1 10-Q"). The 20Q1 10-Q was signed by Defendant Campoli. In the 20Q1 10-Q, the Company reported "approximately $598,000 in revenue from the sales of our vehicles" for the quarter.

71.     These statements in the 20Q1 10-Q were misleading because Defendants knew or were severely reckless in not knowing, but failed to disclose, that R-KEY-MOTO was a related party, and thus the Company's transaction with R-KEY-MOTO was an undisclosed material related party transaction, due to the fact that R-KEY-MOTO was owned and controlled by FOD Capital and Michael Raymond, who owned approximately 9.3% of Arcimoto's common stock at the time of the transaction.

72.     Appended as exhibits to the 20Q1 10-Q were SOX certifications signed by Defendants Frohnmayer and Campoli, wherein they certified that the 20Q1 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "information contained in the Report fairly presents, in all material respects, the financial condition of the registrant at the end of the period covered by the Report and results of operations of the registrant for the periods covered by the Report."

73.     These SOX certifications were false and/or misleading because Defendants knew or were severely reckless in not knowing, that the 20Q1 10-Q did contain misleading statements and omissions of material fact as outlined above, and accordingly, the information contained in the 20Q1 10-Q did not fairly present the financial condition and results of operations of the Company.

74.     On August 19, 2020, Arcimoto filed its quarterly report for the second quarter of 2020 with the SEC on Form 10-Q ("20Q2 10-Q"). The 20Q2 10-Q was signed by Defendant Campoli. In the 20Q2 10-Q, the Company reported "approximately $255,000 in revenue from the sales of our vehicles" for the quarter, and $853,000 for the first six months of the year.

75.     These statements in the 20Q2 10-Q were misleading because Defendants knew or were severely reckless in not knowing, but failed to disclose, that R-KEY-MOTO was a related party, and thus the Company's transaction with R-KEY-MOTO was an undisclosed material related party transaction, due to the fact that R-KEY-MOTO was owned and controlled by FOD Capital and Michael Raymond, who owned approximately 9.3% of Arcimoto's common stock at the time of the transaction.

76.     Appended as exhibits to the 20Q2 10-Q were SOX certifications signed by Defendants Frohnmayer and Campoli, wherein they certified that the 20Q2 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "information contained in the Report fairly presents, in all material respects, the financial condition of the registrant at the end of the period covered by the Report and results of operations of the registrant for the periods covered by the Report."

77.     These SOX certifications were false and/or misleading because Defendants knew or were severely reckless in not knowing, that the 20Q2 10-Q did contain misleading statements and omissions of material fact as outlined above, and accordingly, the information contained in the 20Q2 10-Q did not fairly present the financial condition and results of operations of the Company.

78.     On November 16, 2020, Arcimoto filed its quarterly report for the third quarter of 2020 with the SEC on Form 10-Q ("20Q3 10-Q"). The 20Q3 10-Q was signed by Defendant Campoli. In the 20Q3 10-Q, the Company reported "approximately $620,000 in revenue from the sales of our vehicles" for the quarter, and $1,473,000 for the first nine months of the year.

79.     These statements in the 20Q3 10-Q were misleading because Defendants knew or were severely reckless in not knowing, but failed to disclose, that R-KEY-MOTO was a related party, and thus the Company's transaction with R-KEY-MOTO was an undisclosed material related party transaction, due to the fact that R-KEY-MOTO was owned and controlled by FOD Capital and Michael Raymond, who owned approximately 9.3% of Arcimoto's common stock at the time of the transaction.

80.     Appended as exhibits to the 20Q3 10-Q were SOX certifications signed by Defendants Frohnmayer and Campoli, wherein they certified that the 20Q3 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "information contained in the Report fairly presents, in all material respects, the financial condition of the registrant at the end of the period covered by the Report and results of operations of the registrant for the periods covered by the Report."

81.     These SOX certifications were false and/or misleading because Defendants knew or were severely reckless in not knowing, that the 20Q3 10-Q did contain misleading statements and omissions of material fact as outlined above, and accordingly, the information contained in the 20Q3 10-Q did not fairly present the financial condition and results of operations of the Company.

82.     In addition to misleading investors as to the Company's transaction with R-KEY-MOTO, the Company also flaunted to investors another partnership with an undisclosed related party owned and controlled by FOD Capital. On July 22, 2020, Arcimoto announced a high-profile pilot program with Wahlburgers Key West, a franchise of the casual dining burger restaurant chain, to test one Arcimoto's vehicles. In relevant part, Arcimoto's press release stated:

> Arcimoto, Inc.® (NASDAQ: FUV), makers of the Fun Utility Vehicle® (FUV®), Rapid Responder™, and Deliverator™— affordable, practical, and joyful pure electric vehicles for everyday commuters and fleets—and Wahlburgers are teaming up on a pilot program to field test the Deliverator, Arcimoto's ultra-efficient, three-wheel electric vehicle designed for local and last-mile delivery. The pilot program is anticipated to begin this August at the newest Wahlburgers location coming to the boardwalk of the world-renowned Historic Key West Seaport from the restaurant brand founded by Chef Paul Wahlberg along with brothers Donnie and Mark.

> (Emphasis added.)

### The Company Raised Over $80 Million From Selling Its Common Stock At Artificially Inflated Price During the Class Period, On the Heels of Its R-KEY-MOTO Announcement

83.     Defendants' false and misleading statements and omissions artificially inflated the Company's stock price during the Class Period. This helped Defendants raise critical capital through selling the Company's common stock at a higher price than they would otherwise be able to obtain absent the artificial inflation.

84.     In its 2019 10-K, the Company warned that: "Our ability to continue as a going concern is dependent on raising additional capital to fund our operations and ultimately on generating future profitable operations."

85.     The 2019 10-K also stated that:

> The Company has not achieved positive earnings and operating cash flows to enable the Company to finance its operations internally. *Funding for the business to date has come primarily through the issuance of debt and equity securities. The Company will require*

*additional funding to continue to operate in the normal course of business.* Accordingly, there is substantial doubt about the Company's ability to continue as a going concern.

Although the Company's objective is to increase its revenues from the sales of its products sufficient to generate positive operating and cash flow levels, there can be no assurance that the Company will be successful in this regard. *The Company will need to raise additional capital in order to fund its operations, which it intends to obtain through debt and/or equity offerings.* …

86.     The 2020 10-K similarly stated that:

The Company has not achieved positive earnings and operating cash flows to enable the Company to finance its operations internally. *Funding for the business to date has come primarily through the issuance of debt and equity securities. The Company may require additional funding to continue to operate in the normal course of business.* …

Although the Company's objective is to increase its revenues from the sales of its products sufficient to generate positive operating and cash flow levels, there can be no assurance that the Company will be successful in this regard. *The Company may need to raise additional capital in order to fund its operations, which if needed, it intends to obtain through debt and/or equity offerings.*

87.     On October 4, 2019, just two days after announcing the R-KEY-MOTO rental franchise, the Company filed a prospectus supplement with the SEC on Form 424B5, announcing it was selling just over one million shares of its common stock for net proceeds of approximately $2.144 million.

88.     On November 22, 2019, the Company filed a prospectus with the SEC on Form 424B4, announcing it was selling up to 5,750,000 more shares of its common stock for net proceeds of up to approximately $9.3 million.

89.     In the 2019 10-K, the Company disclosed that in 2019 it raised nearly $15 million from sales of its common stock. The Company also disclosed that it suffered a net loss from operating activities of over $15 million in 2019.

90.     In the 2020 10-K, the Company disclosed that in 2020 it raised approximately $56.8 million from sales of its common stock. The Company also disclosed that it suffered a net loss from operating activities of over $18 million in 2020.

91.     On May 17, 2021, the Company filed its quarterly report for the first quarter of 2021 with the SEC on Form 10-Q ("21Q1 10-Q"). In the 21Q1 10-Q the Company disclosed that in the first quarter of 2021, it raised over $14 million from sales of its common stock. The Company also disclosed that it burned through approximately $5.5 million in net cash from operating activities during that quarter.

92.     According to the 2020 10-K, the Company was also able to use its elevated stock price to retire over $1.3 million in convertible notes using shares of its common stock instead of paying cash. As the 2020 10-K described, on June 25, 2020, "principal amounts of $1,310,893 … were converted into 333,924 shares of common stock at a conversion price of $4.25 per share." Whereas the Company's stock price was approximately $3 at the beginning of the Class Period, by June 25, 2020 the Company's stock price had already climbed nearly 50% to close at $4.43.

93.     These capital raises were critical to the Company, which was reliant on outside financing to fund and maintain its operations. Over the course of the Class Period, Defendants were able to raise over $80 million as the Company took advantage of investor excitement generated in part by its announced R-KEY-MOTO partnership in Key West, and the Company's stock price soared from $3 to almost $17.

<u>A Bonitas Research Report Reveals</u>
<u>Arcimoto's Undisclosed Material Related Party Transactions</u>

94.     On March 23, 2021, before markets opened, Bonitas published a report ("Bonitas Report") revealing that some of Arcimoto's most prominent partners and customers were in fact owned and controlled by a related party. The Bonitas Report stated, in pertinent part:

24

## LARGEST CUSTOMER IS UNDISCLOSED RELATED PARTY FOD CAPITAL

Additional evidence corroborates that there exists little demand for Arcimoto's vehicles from independent paying customers.

Our findings revealed that as of March 2021, Arcimoto Key West had 13 Arcimoto vehicles on-site, making it the single largest location of Arcimoto vehicles worldwide outside of Eugene, Oregon (Arcimoto's HQ).

In 4Q'19, Arcimoto announced its first rental franchisee customer in Key West as R-Key-Moto, LLC ("R-KeyMoto").

Arcimoto Founder Mark Frohnmayer boasted on FUV's 1Q'20 earnings call that R-Key-Moto was "almost up to their full plan of 20 vehicles."

In Arcimoto's 3Q'2020 earnings conference call webinar highlighted the franchisee partnership as a success.

\*       \*       \*

However, ***Arcimoto never mentioned in its investor communications via SEC filings, presentations, earnings calls or promotional videos that R-Key-Moto is an undisclosed related party owned by insider FOD Capital, LLC*** ("FOD Capital").

While Founder Mark Frohnmayer boasted in the 1Q'20 Earnings Call that R-Key-Moto was "almost up to their full plan of 20 vehicles", ***Arcimoto never disclosed any related party revenues from FOD Capital, which at US$ 20,000 per vehicle would amount up to US$ 420,000, or 29% of Arcimoto's total product revenue in 4Q'19 and 1Q'20.***

***R-Key-Moto's 2020 Annual Report lists Michael Raymond and Matthew Strunk as Managers, who are respectively the Managing Director and Director of Accounting and Finance of FOD Capital.***

***In addition, R-Key-Moto shares the same registered address as FOD Capital.***

\*       \*       \*

> In 3Q'20, Arcimoto promoted a pilot program for its Deliverator vehicle with Wahlburgers Key West, whipping up investors' hope for a nation-wide deal with the Mark Wahlberg restaurant chain.
>
> Arcimoto once again failed to disclose that Wahlburgers Key West is actually operated as a franchisee location by Wahlkey, LLC ("Wahlkey"), which is owned by undisclosed related party shareholder FOD Capital.
>
> Wahlkey's 2021 Annual Report lists Michael Raymond as its manager and the same address as FOD Capital.
>
> (Emphasis added.)

95. On this news, Arcimoto's stock price fell $1.10 per share from the prior trading day, or approximately 6.6%, to close at $15.67 per share on March 23, 2021 on unusually high trading volume, damaging investors.

96. To the extent that facts showing that R-KEY-MOTO was owned and operated by FOD Capital and Michael Raymond were publicly accessible, they were not well-known to Arcimoto investors. Thus, disclosure of R-KEY-MOTO as a related party would have significantly altered the total mix of information available to investors about Arcimoto's transaction with R-KEY-MOTO.

97. Arcimoto investors were not required to parse through other business's registration information or other publicly available documents unrelated to Arcimoto itself. Conversely, Defendants, through their direct, repeated interactions with FOD Capital and Michael Raymond, knew or were severely reckless in not knowing, that R-KEY-MOTO was owned and operated by FOD Capital and Mr. Raymond. Accordingly, the Bonitas Report was the first instance when Arcimoto investors were apprised that R-KEY-MOTO was an undisclosed related party.

98. On April 29, 2021, just weeks after the Bonitas Report was published, Defendants admitted that they had engaged in undisclosed material related-party transactions with entities

owned and controlled by FOD Capital. Specifically, in a proxy statement filed that day with the

SEC on Form 14A, Arcimoto disclosed that:

### CERTAIN RELATIONSHIPS AND RELATED-PARTY TRANSACTIONS

\*       \*       \*

*During the years ended December 31, 2019 and 2020, we sold FUVs for $166,203 and $155,688 respectively, to entities controlled by FOD Capital LLC, a 5% shareholder of our common stock*. FOD Capital, LLC also holds franchise rights for the Florida Keys, subject to certain modifications to the terms of our standard franchise agreement including, but not limited to, a right of first refusal for any Company rental franchise in the South Beach Region of Miami Beach, Florida. During 2020 we also received $6,258 in franchise royalties from entities controlled by FOD Capital. Based on a Schedule 13G/A filed with the SEC on February 12, 2021, FOD Capital, LLC indicated their shareholdings are less than 5% of the Company as of that date.

(Emphasis added).

99.     This admission, mere weeks after the Bonitas Report, directly exposed the falsity

of Defendants' statements in the 2020 Proxy Statement, filed in April 2020, which omitted the

Company's transaction with FOD Capital and R-KEY-MOTO in purportedly describing related

party transactions of at least $120,000 "[s]ince January 1, 2019."

100.    According to the 2019 10-K, in 2019, Arcimoto's total revenues from sales of its

vehicles were $891,356. Thus, the undisclosed related party transactions consisting of the

Company's sales of FUVs to FOD Capital represented nearly one fifth of the Company's vehicle

sales revenues in 2019, and about 17% of its total revenues.

101.    According to the 2020 10-K, in 2020, Arcimoto's total revenues from sales of its

vehicles were approximately $2,040,000. Thus, the undisclosed related party transactions

consisting of the Company's sales of FUVs to FOD Capital represented approximately 8% of the

Company's vehicle sales revenues in 2020, and about 7% of its total revenues.

102.     Upon information and belief, as the Company's deal with Wahlburgers Key West was a pilot program involving the sale of only one vehicle, all or nearly all of the revenues the Company generated from sales of FUVs to Company's controlled by FOD Capital in 2019 and 2020 were in connection with the R-KEY-MOTO transaction.

**Defendants Made False and Misleading Omissions and Violated GAAP
by Failing to Disclose Material Related Party Transactions**

103.     Defendants had a duty to disclose the material related party transaction that Arcimoto entered into with R-KEY-MOTO. They violated that duty when they failed to disclose the transaction as a related party transaction, rendering their statements false and misleading. Defendants' duty to disclose the related party transaction arose out of two independent bases – under Item 404(a) of the SEC's Regulation S-K, and under GAAP.

***Defendants Violated Their Duty to Disclose Under Item 404***

104.     Item 404(a) of Regulation S-K (17 C.F.R. § 229.404) requires the disclosure of "any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

105.     Item 404(a) requires the disclosure of (a) the name of the related party and the basis of the relation; (b) the related party's interest in the transaction, including the related party's relationship with an entity that is a party to, or has an interest in, the transaction; (c) the approximate dollar value of the transaction; (d) the approximate dollar value of the related party's interest in the transaction; and (e) any other material information regarding the transaction or the related party in light of the circumstances of the transaction.

106.     The Instructions to Item 404(a) define term related person to include: "b. Any person who was in any of the following categories when a transaction in which such person had a

direct or indirect material interest occurred or existed: i. A security holder covered by Item 403(a) (§ 229.403(a)).” Section 229.403(a) covers “the beneficial owner of more than five percent of any class of the registrant's voting securities.”

107.   Per the SEC’s interpretation, Item 404(a) of Regulation S-K (17 C.F.R. § 229.404) “requires, in pertinent part, disclosure of any transaction since the beginning of the registrant’s last fiscal year between the registrant and any 5 percent shareholder where the amount involved exceeds $120,000 and the 5 percent shareholder has a direct or indirect material interest in the transaction.” Item 404 of Regulation S-K – Transactions with Related Persons, Promoters and Certain Control Persons.[5]

108.   R-KEY-MOTO was a related party of Arcimoto under Item 404(a) due to its ownership and control by FOD Capital and Michael Raymond, who, as Defendants admitted, owned over 5% of Arcimoto’s common stock and voting interests, including at the time of Arcimoto’s transaction with R-KEY-MOTO.

109.   The Company’s transaction, or to the extent it was not yet consummated, proposed transaction, with R-KEY-MOTO was over $120,000, as the Company admitted that “During the years ended December 31, 2019 and 2020, we sold FUVs for $166,203 and $155,688 respectively, to entities controlled by FOD Capital LLC, a 5% shareholder of our common stock.”

110.   Additionally, the R-KEY-MOTO transaction included the sale of 21 FUVs. Arcimoto sold FUVs for approximately $20,000 each. Thus, the R-KEY-MOTO transaction was for approximately $420,000, well over $120,000. Moreover, the Company admitted that it had “delivered its first 8 FUVs to the franchisee by the end of 2019.”

---

[5] *Available at* https://www.sec.gov/divisions/corpfin/guidance/execcomp404interp.htm

## *Defendants Violated Their Duty to Disclose Under GAAP*

111.    GAAP also required the Company to disclose all material related party transactions.

112.    GAAP constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

113.    GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

114.    The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). FASB maintains the Accounting Standards Codification ("ASC"), which is the authoritative source of GAAP in US accounting practices.

115.    SEC, NYSE, and NASDAQ rules and regulations require that publicly traded companies such as Arcimoto include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; SEC Rule 10-01(d) of Regulation S-X.

116.    SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

117.    Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants Professional Standards, vol. 1, AU § 110.03 (1998), provides as follows:

> The financial statements are management's responsibility …
> Management is responsible for adopting sound accounting policies
> and for establishing and maintaining internal controls that will,
> among other things, record, process, summarize, and report

transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. … Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

118.    ASC 850, Related Parties, provides that a public company's "[f]inancial statements shall include disclosures of material related party transactions." ASC 850-10-50-1.

119.    "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." ASC 850-10-50-3. "Affiliate" includes any company that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an enterprise. ASC 850-10-20. "Principal owner" includes any person or entity who is an owner of record or known beneficial owner of more than 10% of the voting interests of the enterprise. ASC 850-10-20.

120.    Disclosures of related party transactions shall include: (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1.

121.    R-KEY-MOTO was a related party of Arcimoto due to its ownership and control by FOD Capital and Michael Raymond, who owned nearly 10% of Arcimoto's common stock and voting interests, including at the time of Arcimoto's transactions with R-KEY-MOTO. Moreover, FOD Capital and Mr. Raymond were the second-largest shareholders of Arcimoto after Defendant

Frohnmayer, and therefore had an outsize influence on the Company, including at the time of Arcimoto's transactions with R-KEY-MOTO.

122.    The Company's transactions with R-KEY-MOTO were material, as the Company's sales of FUVs to FOD Capital represented nearly one fifth of the Company's vehicle sales revenues in 2019, and about 17% of its total 2019 revenues, and approximately 8% of the Company's vehicle sales revenues in 2020, and about 7% of its total revenues.

123.    Each of Arcimoto's 2019 10-K, 20Q1 10-Q, 20Q2 10-Q, and 20Q3 10-Q contained financial statements for Arcimoto that Defendants stated were "prepared in accordance with GAAP."

124.    The 2019 10-K, 20Q1 10-Q, 20Q2 10-Q, and 20Q3 10-Q were materially false and misleading because R-KEY-MOTO was a related party to Arcimoto and, in accordance with GAAP, Arcimoto was required to, but did not, disclose its material transactions with R-KEY-MOTO including: (a) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (b) the dollar amount of transactions for each of the periods for which income statements are presented, and (c) amounts due from or to the companies as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. *See* ASC 850-10-50-1.

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

125.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class.

126.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the

NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

127.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

128.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

129.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the federal securities laws;

(b)    whether during the Class Period Defendants made false or misleading statements of material fact to the investing public, or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)    whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(e)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

130.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

131.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

132.    Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), because the Class's claims are in large part grounded on Defendants' omissions of material facts in their Class Period statements in violation of Defendants' duty to disclose such facts. Thus, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material in that a reasonable investor might have considered them important in making investment decisions. Here, the misleadingly omitted facts were material, so the presumption applies.

133.     Alternatively, Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations pursuant to the fraud-on-the-market doctrine because the Company's common stock traded in an efficient market during the Class Period, in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)     The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of Current Reports in their SEC filings;

(d)     The Company's shares were liquid and traded with moderate to heavy volume during the Class Period. On average, approximately 6.1 million shares of the Company's common stock, or roughly 23% of the Company's total shares outstanding, were traded weekly, permitting a very strong presumption that its shares traded on an efficient market;

(e)     The Company traded on the NASDAQ during the Class Period, and was covered by multiple analysts;

(f)     The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(g)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

134.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

135.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

136.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

137.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and/or misleading statements specified above, which they knew or recklessly disregarded were false and/or misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

138.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

139.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading

36

statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

140.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

141.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. Unaware of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

142.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

143.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

144.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

145.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

146.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.

147.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

148.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged

herein which artificially inflated the market price of Arcimoto common stock during the Class Period.

149.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

150.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**COUNT III**
**Violation of Section 14(a) of the Exchange Act and Rule 14a-9**
**Against Defendants Frohnmayer and Arcimoto**

151.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

152.    The claims set forth herein do not sound in fraud and are based on negligent conduct by Defendants Frohnmayer and Arcimoto ("Section 14 Defendants").

153.    The Section 14 Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder in that they solicited proxies from Plaintiffs and other members of the Class by means of a Proxy Statement that, through the Section 14 Defendants' negligence, contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

154.   Plaintiffs and other members of the Class were misled by the Section 14 Defendants' false and misleading statements and omissions. As a result of the Section 14 Defendants' false and misleading statements and omissions, the market price of the Company's securities was artificially inflated during the Class Period. Unaware of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

155.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

156.   By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.   Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiffs as class representatives and Plaintiffs' counsel as Class Counsel;

B.   Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all of the Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and expert fees; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: September 20, 2021                    Respectfully submitted,

                                             **THE ROSEN LAW FIRM, P.A.**

                                             By:*/s/ Joshua Baker*
                                             Phillip Kim
                                             Joshua Baker
                                             275 Madison Ave., 40th Floor
                                             New York, NY 10016
                                             Tel: (212) 686-1060
                                             Fax: (212) 202-3827
                                             Email: pkim@rosenlegal.com
                                             Email: jbaker@rosenlegal.com

                                             *Lead Counsel for Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 20, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all attorneys of record.

_/s/ Joshua Baker_____
Joshua Baker
