UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

IN RE ARCIMOTO INC., SECURITIES
LITIGATION

**MEMORANDUM & ORDER**
----------------------------------------------------------x
21-CV-2143 (PKC)

PAMELA K. CHEN, United States District Judge:

Lead Plaintiff Tarun Kapoor, on behalf of a putative class, brings this action against Defendant Arcimoto, Inc. ("Arcimoto") based on alleged violations of federal securities laws. Presently, Arcimoto has moved to dismiss Plaintiff's Consolidated Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated herein, the Court grants the motion.

## BACKGROUND[1]

**I.     The Arcimoto-FOD Capital, LLC Deal**

According to its public filings, Arcimoto is a publicly traded Oregon entity operating in the automotive industry and manufacturing small two-passenger, three-wheeled, electric vehicles. (Am. Compl., Dkt. 32, ¶¶ 21, 29, 30.) Defendant Mark Frohnmayer ("Frohnmayer") founded Arcimoto in 2007 and has served as Arcimoto's president and chief executive officer ("CEO") since then. (*Id.* ¶¶ 22, 29.) Defendant Douglas M. Campoli ("Campoli") is Arcimoto's chief

---

[1] For the purposes of this motion, the Court accepts all non-conclusory allegations in the Consolidated Amended Complaint ("CAC") as true. As further discussed *infra*, the Court may consider public disclosure documents filed with the Securities and Exchange Commission ("SEC"), public records susceptible to judicial notice, and documents on which the CAC heavily relies and thereby become integral to it. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (cleaned up)). In this Background Section, the Court therefore considers all public SEC filings, the Report of Bonitas Research, LLC, and public records filed with the Florida Department of State.

financial officer ("CFO"). (*Id.* ¶ 23.) Arcimoto's "flagship product" is a small vehicle named the Fun Utility Vehicle ("FUV"). (*Id.* ¶¶ 2, 34.) The FUV began selling in October 2019, retailing at approximately $20,000 per unit. (*Id.* ¶¶ 2, 34.)

In late 2018, according to public disclosures, Arcimoto struck a deal with an entity named FOD Capital, LLC ("FOD"), with one of its principals being Michael T. Raymond ("Raymond"). (*Id.* ¶¶ 41–45, 53.) On December 27, 2018, Arcimoto filed a public disclosure with the SEC informing the public about the FOD-Arcimoto deal. (*Id.* ¶ 44.) Specifically, Arcimoto disclosed that it had made a deal with FOD, pursuant to which FOD took control of up to 1,442,857 Arcimoto shares, amounting to roughly 9% of Arcimoto's stock. (*Id.*) The next day, Arcimoto filed another public disclosure report with the SEC ("December 8-K Report"). (*Id.* ¶ 41.) There, Arcimoto again stated that it had reached an agreement with FOD giving FOD control of up to 1,442,857 Arcimoto shares and resulting in FOD receiving a $3 million senior secured note. (*Id.*) The disclosure further stated that "[i]n connection with the [FOD-Arcimoto deal], [Arcimoto] granted [FOD] [] franchise rights for the lower Florida Keys[.]" (Dkt. 41-1, at ECF 4.) The disclosure incorporated by reference, and included as exhibits, four different agreements that FOD and Arcimoto had signed. (*Id.* ("[The agreements] are incorporated herein by reference in their entirety."); Am. Compl., Dkt. 32, ¶ 43.) Exhibit 4.1 to the December 8-K Report, titled "Subscription Agreement," featured FOD's business address, "7009 Shrimp Road, Suite #4, Key West, FL 33040," and clearly stated that "Michael T. Raymond" was FOD's manager and had signed the agreement. (Dkt. 41-1, at ECF 8, 14; Am. Compl., Dkt. 32, ¶ 42.)[2] Section 6(l) of the

---

[2] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination,

2

Subscription Agreement reiterated that FOD had received franchise rights for the Florida Keys, subject to Arcimoto's standard franchise Agreement. (Dkt. 41-1, at ECF 19.)

Similar disclosures followed. On or about January 4, 2019, Raymond filed a public disclosure with the SEC notifying the public that he was a resident of Michigan, the manager of FOD, and the controller of up to 1,442,857 Arcimoto shares. (Dkt. 41-1, at ECF 26, 29 ("The investments of FOD [] are managed by [Raymond]. . . As of the date of signing of this report, Mr. Raymond, as the Manager of FOD Capital, has the sole power to vote and dispose . . . of 1,442,857 [Arcimoto shares] owned by FOD Capital."); Am. Compl., Dkt. 32, ¶ 45.) That filing featured FOD's address in the Florida Keys: "7009 Shrimp Road, Suite 4, Key West, FL 33040." (Dkt. 41-1, at ECF 26.) In April 2019, three months later, Arcimoto filed one more disclosure form with the SEC reiterating virtually the same facts and estimating that FOD had actual control or the right to control up to 9.3% of Arcimoto's stock. (Am. Compl., Dkt. 32, ¶ 46.) Five months later, on September 18, 2019, Arcimoto filed yet another public disclosure with the SEC. (Dkt. 41-1, at ECF 194–96; Am. Compl., Dkt. 32, ¶ 47.) The September 2019 disclosure again reminded the public that in December 2018 Arcimoto and FOD had struck a deal, *inter alia*, granting FOD control of 9% of Arcimoto's stock and franchise rights for the Florida Keys, and further advised the public that on September 12, 2019, FOD and Arcimoto had signed a revised agreement that controlled FOD's "franchise rights for the Florida Keys." (Dkt. 41-1, at ECF 195; Am. Compl., Dkt. 32, ¶ 47.) The September 2019 disclosure included, as Exhibit 4.1, the revised subscription agreement itself, which identified Raymond as the manager of FOD. (Am. Compl., Dkt. 32, ¶ 47.)[3]

---

[3] The same information is featured on FOD's website: "FOD Capital's website lists Michael Raymond as its Managing Director, on a page titled 'Our Leadership.' The same webpage

The well-publicized Arcimoto-FOD deal notwithstanding, in 2019 and 2020, Arcimoto was an unprofitable enterprise. (*Id.* ¶¶ 84–86.) In both years, Arcimoto sold less vehicles than it produced, and eleven safety issues emerged in the vehicles it had managed to sell, necessitating public recalls. (*Id.* ¶¶ 32–33.) Former Arcimoto employees alleged that Arcimoto's production processes at the time were substandard, and one employee alleged that during the 2019 to 2020 period Arcimoto was "just scrambling to get things out the door." (*Id.* ¶¶ 36–40.) In both 2019 and 2020, Arcimoto released annual disclosures advising the public that Arcimoto's "ability to continue as a going concern" depended, not on its sales, but on its ability to "rais[e] additional capital." (*Id*. ¶¶ 84–86.) Arcimoto further disclosed its intention to obtain "additional funding" through "debt and/or equity offerings." (*Id*.)

During this period, on October 2, 2019, Arcimoto issued the following press release announcing the launch of its first franchise in the Florida Keys:

> Arcimoto . . . announced today that it has signed its first rental franchise, which will open in the Florida Keys and be operated by Key West-based franchisee R-KEY-MOTO, LLC. . . Located at the Stock Island Marina Village, the new FUV Hub location will house 21 FUVs to be used as rental vehicles for tourists and cruise ship passengers to explore Key West, one of the most popular tourist destinations in the world.

(*Id.* ¶ 56 (emphasis omitted).) The press release included a quote from Michael Raymond as the "principal of R-KEY-MOTO." (*Id.* ¶ 57.) R-KEY-MOTO is a Florida entity whose business address is 7009 Shrimp Road, Suite #4, Key West, FL 33040, and which Raymond controls together with FOD. (*Id.* ¶ 50.) Arcimoto did not identify its transaction with R-KEY-MOTO as a "related party transaction" in any of its subsequent filings with the SEC, including its 2019 annual

---

lists FOD Capital's address as: 7009 Shrimp Road, Suite 4, Key West, FL 33040." (Am. Compl., Dkt. 32, ¶ 49.)

disclosure, its April 2020 proxy statements, and 2020 quarterly reports. (*Id.* ¶¶ 61, 62, 64, 68, 70, 72, 74, 76, 78, 80.)

On July 22, 2020, in another press release, Arcimoto announced that it would be pursuing another venture in the Florida Keys:

> Arcimoto . . . and Wahlburgers are teaming up on a pilot program to field test [an Arcimoto vehicle]. The pilot program is anticipated to begin this August [2020] at the newest Wahlburgers location [in Key West].

(*Id.* ¶ 82.) Wahlburgers is a food business operated through Wahlkey, LLC, a Florida entity whose business address at the time was 7009 Shrimp Road, Suite #4, Key West, FL 33040, and which Raymond controlled together with FOD. (*Id.* ¶¶ 51–52.) Despite the optimistic tone of the press-release, the Wahlburgers-Arcimoto "pilot program" consisted of the sale of a single FUV to Wahlburgers. (*Id.* ¶ 102.)

## II. The Bonitas Report

On March 23, 2021, before the various stock exchanges opened, Bonitas, a self-proclaimed "short-seller"[4] published a report discussing, among others, the Arcimoto-FOD deal (the "Bonitas Report"). (*Id.* ¶ 94.) In relevant part, the Bonitas Report stated the following:

> **LARGEST CUSTOMER IS UNDISCLOSED RELATED PARTY FOD CAPITAL**
>
> . . . In [the fourth quarter of 2019], Arcimoto announced its first rental franchisee customer in Key West as R-Key-Moto, LLC ("R-Key-Moto") . . . However, Arcimoto never mentioned in its investor communications via SEC filings, presentations, earnings calls or promotional videos that R-Key-Moto is an undisclosed related party owned by insider FOD Capital, LLC ("FOD Capital") . . . Arcimoto never disclosed any related party revenues from FOD Capital, which at

---

[4] Short-selling is the practice of speculating on a stock price's drop as a means of making money. In its March 2021 report, Bonitas declared itself to be "biased" and a "short seller." (Dkt. 41-1, at ECF 275 ("You are reading a short-biased opinion piece. We stand to profit if the price of Arcimoto (FUV)'s stock declines.").) Bonitas further stated that "[t]his report and all statements contained herein . . . are not statements of fact." (*Id.*)

5

> US$ 20,000 per vehicle would amount up to US$ 420,000, or 29% of Arcimoto's total product revenue in [the fourth quarter of 2019] and [the first quarter of 2020]. R-Key-Moto's 2020 Annual Report lists Michael Raymond and Matthew Strunk as Managers, who are respectively the Managing Director and Director of Accounting and Finance of FOD Capital. In addition, R-Key-Moto shares the same registered address as FOD Capital.
>
> In [the third quarter of 2020], Arcimoto promoted a pilot program . . . with Wahlburgers Key West . . . Arcimoto once again failed to disclose that Wahlburgers Key West is actually operated as a franchisee location by Wahlkey, LLC ("Wahlkey"), which is owned by undisclosed related party shareholder FOD Capital. Wahlkey's 2021 Annual Report lists Michael Raymond as its manager and the same address as FOD Capital[.]

(Dkt. 41-1, at ECF 269–71.) Bonitas advised its readership that they "c[ould] publicly access any piece of evidence cited in this report or that we relied on to write this report." (*Id.* at ECF 275.) Accordingly, Bonitas corroborated the above-cited portion of its report with citations to Arcimoto's public filings and internet websites displaying pictures of information, seemingly stored with the Division of Corporations of the Florida Department of State. (*Id.* at ECF 269–71; *see also* Am. Compl., Dkt. 32, ¶¶ 49, 51 (repeating, in effect, information contained in the Bonitas Report, *see* Dkt. 41-1, at ECF 269 n. 15 and ECF 271.).)

Following the Bonitas Report's release, the price of Arcimoto's shares dropped 6.6%. (Am. Compl., Dkt. 32, ¶ 95.) On April 29, 2021, weeks after the Bonitas Report issued, Arcimoto issued a corrective disclosure stating that "[d]uring the years ended December 31, 2019 and 2020" Arcimoto had engaged in transactions with "entities controlled by FOD[.]" (Am. Compl., Dkt. 32, ¶ 98 (emphasis omitted).)

### III. Procedural History

On April 19, 2021, this putative class action was filed. (Dkt. 1.) On July 14, 2021, the Court consolidated this action with two related class actions. (*See* 07/14/2021 Docket Entry.) On September 20, 2021, on his own accord, Lead Plaintiff Kapoor, on behalf of the putative class, amended the prior Complaint and filed the CAC. (Dkt. 32.) Plaintiffs allege that, on numerous

occasions, Defendant omitted material facts—namely, that Arcimoto's franchises in the Key West stemmed from undisclosed deals with parties connected to FOD and Raymond, the controllers of up to 9% of Arcimoto's shares—in violation of 15 U.S.C. § 78j(b) ("Section 10(b)"), 15 U.S.C. § 78t(a) ("Section 20(a)"), and 17 C.F.R. §§ 240.10b-5 ("Rule 10b-5").[5] On March 11, 2022, Arcimoto filed a motion to dismiss the CAC pursuant to Federal Rule of Civil Procedure 12(b)(6), which Plaintiffs now oppose. (Dkts. 40–44.)

## STANDARD OF REVIEW

To withstand a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Spira v. Aeroflot-Russian Airlines*, 552 F. Supp. 3d 418, 422 (E.D.N.Y. 2021) (ultimately citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (quotations omitted). "The plausibility standard does not require detailed factual allegations, but it demands more than unadorned, the-defendant-unlawfully-harmed-me accusations." *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 175 (E.D.N.Y. 2019) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (cleaned up). A complaint must contain sufficient "factual content," generally accepted as true, to allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 554 F. Supp. 3d 448, 457 (E.D.N.Y. 2021) (quoting *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011)).

"A complaint alleging securities fraud under Section 10(b) of the Exchange Act is subject to two heightened pleading standards." *Zhong*, 379 F. Supp. 3d at 175. Each complaint must both

---

[5] Plaintiffs also brought claims pursuant to Section 14(a) of the Exchange Act which they subsequently withdrew. (Dkt. 36, at 3 ("Upon reviewing Defendants' arguments and further review of the relevant case law, Plaintiffs concede that the Complaint fails to state a claim under Section 14(a).").)

7

satisfy the exacting pleading standard set forth at Rule 9(b) and "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), and further "'specify' each misleading statement; . . . set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and . . . 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

## DISCUSSION

### I. Judicial Notice

As an initial matter, the Court identifies the filings and other materials beyond the CAC that the Court has considered in ruling on Arcimoto's Rule 12(b)(6) motion.

#### A. Legal Standard

Along with the complaint itself, a court may properly consider documents that "are attached to the complaint, incorporated in it by reference, integral to the complaint, or the proper subject of judicial notice." *Thompson v. Glob. Contact Servs., LLC*, No. 20-CV-651 (MKB), 2021 WL 3425378, at *5 (E.D.N.Y. Aug. 4, 2021) (ultimately citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)) (cleaned up). While the "Court generally accepts a plaintiff's allegations as true," the Court "need not do so where the allegations are contradicted by matters properly subject to judicial notice." *J & J Sports Prods., Inc. v. Gomez*, No. 18-CV-5119 (KAM) (CLP), 2019 WL 4744229, at *4 (E.D.N.Y. Sept. 29, 2019) (collecting cases).

"Courts are permitted to take judicial notice of documents that are integral to the complaint and of materials in the public record for the limited purpose of noting what the documents state, rather than to prove the truth of their contents." *Ganske v. Mensch*, 480 F. Supp. 3d 542, 546 (S.D.N.Y. 2020) (citation and quotation marks omitted); *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209,

223 (N.D.N.Y. 2014) (same). Courts in this Circuit routinely consider on a motion to dismiss legally required public disclosure documents filed with the SEC, documents possessed by or known to the plaintiff and upon which it relied in bringing the suit, and public records. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (considering documents relied upon by the plaintiff and public SEC disclosures); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (considering documents not incorporated by reference in the complaint when the "complaint relie[d] heavily upon [their] terms and effect," thus rendering them "integral" to the complaint); *Blue Tree Hotels Inv. (CANADA), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (considering public records). The Court need not examine documents in isolation but may consider them alongside others documents to establish whether identical or overlapping statements were made. *See, e.g.*, *Abdin v. CBS Broad., Inc.*, 971 F.3d 57, 60 n.2 (2d Cir. 2020) (finding that the district court properly considered various scientific publications together and concluded that they contained identical statements underscoring the "relevant discussion in the scientific community" at the time); *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022) (affirming the district court's consideration of publicly available reports and the comparison of their stated conclusions to those of other reports noted in the complaint); *Christian v. TransPerfect Glob., Inc.*, No. 17-CV-5554 (PKC), 2018 WL 4571674, at *3 n.1 (S.D.N.Y. Sept. 24, 2018) (taking judicial notice of separate complaints filed in other courts and noting that they contained "virtually identical" statements); *Garden City Boxing Club, Inc. v. Rodriguez*, No. CV 2005-1039 (DGT) (MDG), 2007 WL 9718808, at *1 (E.D.N.Y. Sept. 4, 2007) (similar).

B.     **Application**

Here, the gravamen of this action is that in March 2021, the Bonitas Report revealed hitherto unknown associations between Arcimoto, FOD, R-KEY-MOTO, and Wahlburgers to the market. (Am. Compl. Dkt. 32, ¶¶ 94–102.) The precise terms and effects of the Bonitas Report—which the CAC extensively discusses—are central to this action. (*Id.*; Dkt. 41-1, at ECF 273–75.) Thus, the Court may properly consider the statements in the Report.

Likewise, the Court takes judicial notice of the existence of, and statements contained in, public records filed with the Division of Corporations in the State of Florida ("DCSF"). Specifically, on file with DCSF are the business reports of "R-KEY-MOTO LLC" dating back to February 2019; reports for "FOD Capital LLC," dating back to 2017; and reports for "Wahlkey, LLC," dating back to October 2019. *See* Division of Corporations, Florida Department of State, https://search.sunbiz.org/Inquiry/CorporationSearch/ByName (search "R-KEY-MOTO LLC," "FOD Capital LLC," or "Wahlkey, LLC" (current as of Dec. 21, 2022)). Those reports state, whether accurately or not, that "7009 SHRIMP RD STE 4 KEY WEST, FL 33040" is each of the three entities' principal place of business and that Michael Raymond is each entity's manager or president. *See J & J Sports Prods., Inc.*, 2019 WL 4744229, at *5 (taking judicial notice of the New York State Department of State ("NYSDOS") database and the business address it identified); *Paysafe Partners LP v. Merchants Payment Grp. LLC*, No. 19 Civ. 495 (LGS), 2019 WL 1986607, at *1 n.1 (S.D.N.Y. May 6, 2019) (taking judicial notice that the respondent "is listed as an active entity in [NYSDOS's] Corporation and Business Entity Database.").

Lastly, the Court further notes that those DCSF records contained statements identical to those appearing in the Bonitas Report. The Bonitas Report itself, in support of its conclusions as to various connections between FOD and its affiliates, features websites displaying pictures of

10

searches purportedly conducted on DCSF's and the SEC's databases. The Court notes that the statements in records on file with DCSF and the SEC are indistinguishable from pictures displayed in the Bonitas Report. (*Compare* Dkt. 41-1, at ECF 270 (picture 3) *with* https://search.sunbiz.org/Inquiry/CorporationSearch/ByName (search "R-KEY-MOTO LLC," and select "06/04/2020 -- ANNUAL REPORT" (last accessed Dec. 21, 2022)).) Thus, the Court concludes that, as a factual matter, the Bonitas Report contained statements already circulating in the public sphere.[6]

## II. The CAC's Securities Claims Are Insufficiently Pled

"To state a cause of action under [S]ection 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *In re Curaleaf Holdings, Inc. Sec. Litig.*, 519 F. Supp. 3d 99, 106 (E.D.N.Y. 2021) (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996)). Relatedly, to prevail on a Section 20(a) claim (*i.e.*, an aiding and abetting claim) under the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Zhong*, 379 F. Supp. 3d at 177 (citing *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014)). By implication, "if a plaintiff has not adequately alleged a primary violation . . . then the § 20(a) claims must be dismissed." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 22–23 (S.D.N.Y. 2016).

---

[6] The Court further notes the obvious fact that internet websites themselves are publicly accessible.

A.  **Plaintiffs' Section 10(b) and Rule 10b-5 Claims About Non-Disclosure of the Relationship Between Arcimoto, R-KEY-MOTO, and Raymond Fail for Lack of Causation**

Because the CAC fails to adequately plead loss causation with respect to all of its security law claims, the Court dismisses this matter. Rule 10b-5 claims require proof of "reliance" and "loss causation." Reliance, often labeled "transaction causation," requires a "but for" causal relationship between the alleged wrongful conduct and the plaintiff's decision to invest. *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001) (finding that reliance requires that, "*but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction[.]"); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811–13 (2011) (same). In the context of class actions, however, courts have recognized that "the requirement of showing direct reliance presents an unreasonable evidentiary burden," and instead presume reliance when all members of the class "purchased or sold securities in an efficient market" that incorporates all available data into the price of available securities. *See, e.g.*, *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir. 2000).[7]

"Loss causation," by contrast, is virtually synonymous with "traditional proximate cause" and requires a showing that the "allegedly unlawful conduct," as opposed to other intervening events, "caused the economic harm" that ultimately resulted. *See Mazuma Holding Corp. v. Bethke*, 21 F. Supp. 3d 221, 230 (E.D.N.Y. 2014) (cleaned up). Loss causation may be shown by allegations that "the market reacted negatively to a corrective disclosure of the fraud" after something or someone "reveal[d] some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501,

---

[7] Plaintiffs availed themselves of this reliance presumption as part of their CAC (Dkt. 32, ¶¶ 133–34), as well as to the related presumption for omissions. (*Id.* ¶ 132.)

511 (2d Cir. 2010) (citation omitted). Put differently, publications that merely characterize information already circulating in the public sphere in a negative way cannot prove loss causation. *Id.* at 512; *Cent. States, Se. and Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) ("[C]orrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time[.]" (citation omitted)).[8] The idiosyncratic reactions of the market to already known facts is no basis for compensation. *See Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 187–88 (4th Cir. 2007) ("Because no [new] facts were disclosed, the drop in [the] share price . . . more logically occurred because the market feared [other things]."); *Omnicom*, 597 F.3d at 512 (finding that when an article that caused the decline in share price only disclosed the "journalists' opinions" about already known facts, loss causation was not satisfied).[9]

This case is on all fours with *Omnicom*. There, following an early-2001 transaction where Omnicom paid more than $45 million to another company, media reports speculated that Omnicom

---

[8] Recognizing that an efficient market is not all-knowing, the law makes a narrow exception for buried facts that are inaccessible to the market. *See Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020) (finding that filings in the Chinese language, namely, records on file with the Chinese government and judgments of the Chinese courts, were not publicly accessible); *see also Koppel v. 4987 Corp.*, 167 F.3d 125, 132 (2d Cir. 1999) (noting, in the related context of what information formed part of the "total mix" available to investors, that a report available for inspection only in a company's offices in New York during business hours was inaccessible to the market). The general rule remains, however, that corrective disclosures must contain facts not previously circulating in the public sphere. *See Canez v. Intelligent Sys. Corp.*, No. 19-CV-3949 (RPK) (CLP), 2021 WL 3667012, at *9 (E.D.N.Y. Aug. 18, 2021); *Zhong*, 379 F. Supp. 3d at 178–79 (same).

[9] Other courts treat the rule as a corollary of the "fraud on the market" presumption to which plaintiffs often, including in this case, seek to avail themselves to prove class-wide reliance. *See Meyer v. Greene*, 710 F.3d 1189, 1198–99 (11th Cir. 2013) ("The efficient market theory . . . is a Delphic sword[;] . . . [a plaintiff] cannot contend that the market is efficient [and incorporates all available data] for purposes of reliance and then cast the theory aside when it no longer suits their needs for purposes of loss causation. Either the market is efficient or it is not."); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 271 (3d Cir. 2005) ("An efficient market for good news is an efficient market for bad news."). Although the Second Circuit did not explicitly state so, it did find important to observe in *Omnicom* that the plaintiff had invoked the "fraud on the market" presumption. *See Omnicom*, 597 F.3d at 510.

had orchestrated a sham scheme—with no real business purpose—to cut ties with its subsidiary whose value was plummeting. *See Omnicom*, 597 F.3d at 503–06. In 2002, Omnicom notified its investors that its director had resigned; the *Wall Street Journal* followed with an article repeating the details of the 2001 transaction; and, Omnicom's share price dropped. *Id.* at 506–08, 511. The Second Circuit held that because the *Wall Steet Journal* article revealed no new "[factual] information" regarding "Omnicom's alleged fraud," the plaintiff had failed to plead loss causation. *Id*. at 513. Here, the crux of Plaintiffs' argument regarding the CAC's causation pleading is that Arcimoto's press release did not disclose that the transaction between Arcimoto and R-KEY-MOTO was a "related party transaction." However, as in *Omnicom*, the Bonitas Report—which purported to disclose this relationship—simply parroted facts already in the public sphere. Plaintiffs' argument, therefore, boils down to the contention that the Bonitas Report added new information to the mix because, for the first time, the Report labeled the R-KEY-MOTO deal a "related party transaction." Legal labels, however, reveal no new facts; instead, they are opinions or conclusions drawn from existing facts. As all of the data necessary to form that opinion or draw that conclusion (legal or otherwise) about the R-KEY-MOTO transaction was readily available—in Arcimoto's own SEC public filings—"it [was] not deceptive" for Arcimoto "to fail to verbalize all adverse inferences [that could be made from previously disclosed existing facts] expressly," and the Report's verbalization of such inferences cannot support loss causation. *See Sable v. Southmark/Envicon Cap. Corp.*, 819 F. Supp. 324, 334 (S.D.N.Y. 1993) (collecting cases); *In re Curaleaf Holdings*, 519 F. Supp. 3d at 108 (noting generally that "not every public statement made by the [c]ompany need contain the full roster of disclosures detailed in the [c]ompany's securities filings."); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 378 (E.D.N.Y. 2003) (observing, in the related context of duty to speak, that "[i]t is pointless and costly to compel firms to reprint

information already in the public domain[.]") (citation omitted). Thus, whether because the CAC, at most, alleges that a sensationalized portrayal of already-public information regarding the relationship between R-KEY-MOTO and Raymond caused Plaintiffs' losses, or whether because having chosen to plead "the efficient market theory," Plaintiffs "must now abide by its consequences," *Meyer*, 710 F.3d at 1198, the Court concludes that the CAC's claims based on the allegedly fraudulent failure to disclose the relationship between Arcimoto, R-KEY-MOTO, and Raymond fail for lack of loss causation.[10]

> B. **Plaintiffs' Section 10(b) and Rule 10b-5 Claim About Non-Disclosure of the Relationship between Wahlburgers, Other Entities, and Raymond Fails for Lack of Materiality and Inadequate Pleading of Scienter**

The information as to Wahlkey, LLC, however, was harder to obtain. The press release about the Wahlburgers deal mentioned neither Wahlkey, LLC, nor Raymond, and a reasonable investor would have had to divine the relationship between multiple scattered entities to infer that a related transaction had occurred. It would reward opaqueness for the Court to hold that where the chain of information linking multiple entities is scattered across multiple States, the information is sufficiently accessible to the market. An efficient market is not omniscient, and the Court doubts that the theoretical availability of such information relating to Wahlburgers' relationship with Arcimoto, Raymond, and R-KEY-MOTO would have defeated causation on its own.

Nonetheless, the Court finds that the CAC's claim as to the Wahlburgers deal does not pass muster for other reasons. First, the Court finds that the transfer of one vehicle as a result of the

---

[10] Because the Court finds Arcimoto's causation argument dispositive, it does not consider Arcimoto's remaining arguments in support of its motion, including whether Arcimoto had a duty to speak, that is, to specifically describe the transaction between Arcimoto and R-KEY-MOTO as a related party transaction.

Wahlburgers-Arcimoto "pilot program" was of relative unimportance when compared to the volume of transfers alleged in the complaint. (*See* Dkt. 32, ¶¶ 102, 90 ("In the 2020 10-K, the Company disclosed that in 2020 it raised approximately $56.8 million from sales of its common stock.").) The Wahlburgers deal, involving a $20,000 sale, thus comprised less than 0.04% of Arcimoto's annual revenues. Thus, any information omitted falls into the narrow category of transactions that are immaterial on their face. *See Canez*, 2021 WL 3667012, at *9 (dismissing a Rule 10b-5 claim based on failure to disclose "material related party transaction," where the complaint "[did] not allege with particularity any facts supporting an inference that those investments were material") (quotation marks omitted) (citing *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 202 (2d Cir. 2009)).

Second, the CAC fails to adequately plead scienter with respect to the Section 10(b) and Rule 10b-5 claims as to the Wahlburgers deal. While the CAC is replete with negative innuendos about the deal between Arcimoto and Wahlburgers, the actual pleading of scienter is boilerplate. (Dkt. 32, ¶ 54 ("[I]n the course of discussing, negotiating, and signing the myriad agreements between Arcimoto . . . and Wahlburgers Key West, Defendants must have known, or were severely reckless in not knowing [that Wahlkey, LLC was a related party].); *see also id.* ¶ 60 ("Defendants knew or were severely reckless in not knowing, but failed to disclose . . ."); *id.* ¶ 63 (similar); *id.* ¶ 65 (similar).) The CAC falls far below what Congress had envisioned when enacting the heightened pleading standard of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* 15 U.S.C. § 78u-4(b)(2)(A) ("[T]he complaint shall . . . *state with particularity facts* giving rise to a *strong inference* that the defendant acted with the required state of mind." (emphasis added)). Thus, the CAC's claims based on the failure to disclose the relationships between Wahlburgers, Wahlkey, LLC, Arcimoto, R-KEY-MOTO, and Raymond must be dismissed.

### C. Plaintiffs' Section 20(a) Claims Necessarily Fall with Their Section 10(b) and Rule 10b-5 Claims

Finally, because all of the CAC's substantive claims under Section 10(b) and Rule 10b-5 are dismissed, Plaintiffs' claims for aiding and abetting under Section 20(a) must also be dismissed. *Lopez*, 173 F.Supp.3d at 22–23 ("If a plaintiff has not adequately alleged a primary violation . . ., then the § 20(a) claims must be dismissed.").

## III. Leave to Amend

"[A] district court has discretion to deny leave [to amend a complaint] for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *See Doninger v. Niehoff*, 642 F.3d 334, 357 (2d Cir. 2011) (ultimately citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)) (quotation marks and brackets omitted). It is well-established that "[t]here is no general rule that just because the complaint is brought under the federal securities laws, a plaintiff will automatically receive leave to amend." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 621 (2d Cir. 2009) (collecting cases). Specifically, "a proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *See Zhong*, 379 F. Supp. 3d at 182 (citing *Martin v. Dickson*, 100 F. App'x 14, 16 (2d Cir. 2004)). Here, because Plaintiffs' alleged losses all stem from the Bonitas Report, which, in turn, is based entirely on public information, the Court finds that another amendment to the CAC would be futile as to the alleged non-disclosures relating to Arcimoto, R-KEY-MOTO, and Raymond. Likewise, the Court finds that another amendment of the CAC, with respect to the Wahlburgers deal, would be futile because, as previously stated, the transaction involved the sale of one FUV—a miniscule fraction of Arcimoto's overall revenue—and was thus immaterial as a matter of law.

17

## CONCLUSION

For the foregoing reasons, the Court grants Arcimoto's motion to dismiss the CAC in its entirety for failure to state a claim under Rule 12(b)(6). All pending motions are denied as moot. The Clerk of Court is respectfully directed to enter judgment accordingly and terminate this action.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: December 22, 2022
       Brooklyn, New York